UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY RAY SPENCER,

                Plaintiff,                               Hon. Janet T. Neff

v.                                           Case No. 1:18-cv-643

JULIE SANFORD and MARY JO
DOLLAR,

                Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING
ECF NOS. 128, 133; ORDER REGARDING ECF NO. 135**

Plaintiff, Timothy Spencer, a prisoner incarcerated with the Michigan Department of Corrections (MDOC), filed his complaint in this case on June 7, 2018, against several MDOC personnel employed at the Bellamy Creek Correctional Facility, alleging that they improperly rejected a number of issues of his subscription to Prison Legal News (PLN) pursuant to an MDOC mail policy in violation of his First Amendment rights. The current operative pleading—Spencer's third amended complaint—alleges that Defendants Julie Sanford and Mary Jo Dollar violated Spencer's First Amendment rights when they rejected three issues of his subscription to PLN at Marquette Branch Prison (MBP) between June 2018 and July 2019. Spencer sues Defendants Sanford and Dollar solely in their individual capacities.

This matter is presently before me on Defendants' Motion for Summary Judgment (ECF No. 128), Spencer's Motion to Strike Portions of Norma Killough's Affidavit (ECF No. 133), and Spencer's Motion for Leave to File Fourth Amended Complaint (ECF No. 135). For the following reasons, the motion to amend will be **DENIED**. Furthermore, pursuant to 28 U.S.C. §

636(b)(1)(B), I recommend that Plaintiff's motion to strike be **DENIED** and that Defendants' motion for summary judgment be **GRANTED**.

## I.  Background

In March 2018, Spencer was transferred from Bellamy Creek Correctional Facility in Ionia, Michigan, to MBP. In June 2016, prior to the transfer, Spencer purchased a three-year subscription to Prison Legal News (PLN), a monthly publication of the Human Rights Defense Center containing, among other things, full-length news stories, case citations for specific legal issues, prisoner-related advertisements, and a section entitled "Criminal Justice Resources." (ECF No. 122 at PageID.956–57.) Between March 2018 and July 2019, Defendants Sanford and Dollar— who are employed by the MDOC as mailroom staff at MBP[1]—rejected three issues of Spencer's subscription to PLN on the ground that they contained at least one article that violated MDOC Policy Directive 05.03.118, the primary MDOC policy governing prisoners' sending and receipt of mail.[2]

MDOC Policy Directive 05.03.118 provides that prisoners may send and receive uncensored mail to or from any person or organization unless the mail violates the policy or Administrative Rule 791.6603.[3] Mich. Dep't Corr., Policy Directive 05.03.118 ¶ D. All incoming mail that does not receive special handling, *e.g.*, legal mail, must be opened in one location at each facility and inspected to determine whether it contains contraband. (*Id.* ¶ DD.) Mail cannot be

---

[1]  Defendant Dollar retired from the MDOC on April 6, 2020. (ECF No. 129-2 at PageID.1045.)

[2]  Spencer alleges that two issues were rejected between March and July 2018, but he attaches evidence of three rejections to his third amended complaint: (1) a June 21, 2018 rejection by Sanford of the March 2018 issue of PLN; (2) a June 20, 2019 rejection by Sanford of the June 2019 issue of PLN; and (3) a July 11, 2019 rejection by Dollar of the July issue of PLN. (ECF Nos. 122-3, 122-4.)

[3]  The version of Policy Directive 05.03.118, effective March 1, 2018, is the applicable version in effect at the time of the mail rejections.

prohibited "solely because its content is religious, philosophical, political, social, sexual, unpopular, or repugnant." (*Id.* ¶ D (emphasis in original).) However, mail can be rejected if it is deemed to "pose a threat to the security, good order, or discipline of the facility, facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner." (*Id.* ¶ NN.) Prisoners are permitted to receive books, magazines, and other publications only if : (1) ordered by a member of the public from a preapproved internet vendor or from the publisher and sent directly to the prisoner by the vendor or publisher; (2) ordered by the prisoner from a pre-approved vendor or from the publisher and sent by the vendor or publisher directly to the prisoner; or (3) sent from an approved correspondence school in connection with an approved correspondence course. (*Id.* ¶ Z(1)–(3).)

When prisoner mail is opened and "believed to be in violation of [the] policy," the mail room staff must complete and promptly send to the prisoner a Notice of Package/Mail Rejection. The Notice must identify the specific item believed to violate policy and explain why the item is believed to violate policy. (*Id.* ¶ VV.) Unless the prisoner waives his right to a hearing, and the prisoner and staff agree on the appropriate disposition of the mail, a prompt hearing must be conducted to determine whether the mail violates the policy for the reasons stated in the Notice. The person who issued the Notice may not serve as the hearing officer. (*Id.* ¶ WW.) At the hearing, the prisoner must be provided an opportunity to review the mail unless the review would present security issues. (*Id.* ¶ XX.) If the hearing officer determines that there is no violation, the mail must be returned to the prisoner. (*Id.* ¶ YY.) If the hearing officer upholds the determination in the Notice, the hearing officer must determine the appropriate disposition of the mail. (*Id.* ¶ ZZ.) A prisoner who disagrees with the outcome may file a grievance pursuant to the MDOC's grievance policy. (*Id.* ¶ EEE.)

3

On June 21, 2018, Defendant Sanford issued a Notice of Package/Mail Rejection of Spencer's copy of the March 2018 edition of PLN. The Notice referenced a Michigan News in Brief article on page 64 regarding a Trinity Services Group employee smuggling heroin into MDOC facilities and various other violations. The Notice cited Paragraphs NN ("mail that may pose a threat to the security, good order, or discipline of the facility, facilitate criminal activity, or interfere with the rehabilitation of the prisoner") and NN#4 ("[m]ail advocating or promoting violence, group disruption, or insurrection") of Policy Directive 05.03.118 as the bases for the rejection. (ECF No. 122-4 at PageID.999.) The article discussed problems that MDOC and other prison systems and jails around the United States had experienced with Trinity's food service, including spoiled food and low-quality meals. Regarding Trinity's poor performance within MDOC facilities, the article noted that prisoners at four MDOC facilities had engaged in hunger strikes to protest substandard meals, and inmates at one of the facilities eventually rioted. Apart from the substandard meals, the article noted that 180 Trinity employees in MDOC facilities had been cited for misconduct, including smuggling contraband and having improper relationships with prisoners. The article did not expressly identify the contraband as heroin. (ECF No. 131-10.)

Sanford issued another Notice of Package/Mail Rejection on June 20, 2019, regarding Spencer's June 2019 edition of PLN. The Notice referenced an article titled "Michigan Hit with Multiple Lawsuits Related to Women's Prison" and indicated that it described inmate overcrowding and contained information about current lawsuits. The Notice cited paragraphs NN and NN#4 of Policy Directive 05.03.118 as the bases for the rejection. (ECF No. 122-4 at PageID.996.) The article discussed three lawsuits concerning the MDOC's Women's Huron Valley Correction Facility (WHV). The first lawsuit was brought by the Department of Justice on behalf of female guards at WHV who were forced to work excessive amounts of overtime that jeopardized

4

their health and safety. The second lawsuit was brought by male guards at WHV who complained about the lack of opportunities for male guards at the prison. The third lawsuit was brought by female prisoners at WHV who alleged overcrowding; being packed into former closets, offices, classrooms, and other areas not designed as living spaces; and denial of recreation, clothing, medical treatment, and toilet paper. The article also mentioned an increase in suicide attempts and a scabies outbreak, which were typical events for an overcrowded facility. (*Id.* at PageID.997–98.)

On July 11, 2019, Defendant Dollar issued a Notice of Package/Mail Rejection regarding Spencer's July edition of PLN. The notice referenced two articles, one pertaining to a settlement with a prisoner regarding parole violation sanctions, and the other pertaining to a class-action settlement with MDOC prisoners with hearing disabilities. The Notice cited paragraphs NN and NN#4 of Policy Directive 05.03.118 as the bases for the rejection. (ECF No. 122-3 at PageID.991.) Pursuant to Spencer's request, hearing officer F. Johnson held a hearing and determined that the articles did not violate MDOC policy, noting:

> The articles in question have no information that is not already accessible to the General Population in the Prison Law Library. There is nothing in the articles that advocate for any types of violence, group disruption, and/or insurrection.

(ECF No. 129-4 at PageID.1058.)

## II.   Discussion

### A.   Motion to Strike

In support of their reply to Spencer's response to their motion for summary judgment, Defendants attached an affidavit from Norma Killough, an Administrative Assistant in Correctional Facilities Administration who has been employed by the MDOC for 34 years. Killough was involved in developing the MDOC's mail policy and is responsible for notifying facilities when a determination has been made that a publication should be rejected on a state-wide basis. (ECF No. 132-3 at PageID.1186–87.) Defendants submitted the Killough affidavit to explain

5

how details in articles involving the MDOC, its staff, or its prisoners can support the rejection of a particular article.[4]

Spencer moves to strike certain paragraphs of Killough's affidavit that he claims contradict her prior deposition testimony, arguing that they create "a sham issue of no material fact during summary judgment proceedings."[5] (ECF No. 133 at PageID.1194.) Spencer relies on the rule stated in *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453 (6th Cir. 1986), that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Id.* at 460. As explained in *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899 (6th Cir. 2006), "[t]he rule set forth in *Reid* is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists." *Id.* at 907. In general, the doctrine applies only "against a party who attempts to avoid summary judgment by filing *his own* affidavit that directly contradicts *his own* prior sworn testimony." *France v. Lucas*,

---

[4] The Sixth Circuit has stated that, when a party submits new material in its reply brief, "the district court should allow the nonmoving party an opportunity to respond, particularly where the court's decision relies on new evidentiary submissions." *Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 548 (6th Cir. 2014) (citing *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003)). Here, Spencer's motion to strike represents an adequate opportunity to respond to Killough's affidavit by pointing out alleged inconsistencies with her prior deposition testimony. In addition, Spencer has had ample time to seek leave to offer any further evidence or argument he believes is responsive to Killough's testimony in her affidavit.

[5] Defendants point out, correctly, that Federal Rule of Civil Procedure 12(f) applies only to pleadings, not affidavits. *See Fox v. Michigan State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006). Nonetheless, a court may disregard any improper factual allegation or deficient evidentiary submission, if warranted, in ruling on a motion for summary judgment. *See Nelson v. Clermont Cnty. Veterans Serv. Comm'n*, No. 1:11-cv-335, 2013 WL 5934393, at *5 (S.D. Ohio Nov. 1, 2013) (noting that "the precise issue is whether the Court should *disregard*, rather than *strike*, any inadmissible evidence for purposes of summary judgment"); *Foshee v. Forethought Fed. Sav. Bank.*, No. 09-2674, 2010 WL 2158454, at *3 (W.D. Tenn. May 7, 2010) ("Courts presented with inadmissible evidence should disregard the evidence rather than striking it from the record."). Moreover, the Sixth Circuit has expressly recognized a district court's authority to strike a "sham" affidavit. *See Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006).

836 F.3d 612, 623 (6th Cir. 2016) (italics in original). "[T]he doctrine does not fit where the *moving* party files an allegedly contradictory affidavit with his or her motion for summary judgment." *Reed v. City of Memphis*, 735 F. App'x 192, 198 (6th Cir. 2018). This is because a moving party lacks incentive to create an issue of fact by filing an affidavit contradicting prior deposition testimony. *Id.* In such situation, a moving party's contradictory affidavit will usually benefit the non-moving party under the rule that evidence is to be construed in the light most favorable to the non-moving party. *Id.* (citing *Smith v. County of Lenawee*, No. 09-10648, 2011 WL 1150799, at *12 (E.D. Mich. Mar. 28, 2011), *aff'd in part, rev'd in part on other grounds*, 505 F. App'x 526 (6th Cir. 2012)). In other words, any conflict in the moving party's evidence may well create a genuine issue of material fact that precludes summary judgment. Accordingly, Spencer's motion should be denied solely on the basis that the sham affidavit doctrine is inapplicable in these circumstances.

Even if the doctrine applied here, Spencer fails to show that the cited paragraphs of Killough's affidavit—paragraphs 4, 7, 8, and 12–14—contradict her prior deposition testimony. For context, during the deposition, Spencer's counsel questioned Killough about various articles, most of which were not at issue in this case, to probe how Killough would apply Policy Directive 05.03.118 to the particular article; would she reject it, and if so, on what basis, or would she let it through? In contrast, Killough's affidavit primarily speaks to general concerns when evaluating a particular article. Spencer's motion fails as follows:

- <u>Paragraph 4</u>. Here, Killough states that she is responsible for sending out emails about articles that are deemed to present a department-wide threat and should be rejected at all facilities. (ECF No. 132-3 at PageID.1187.) This is exactly what Killough said in her deposition. (ECF No. 133 at PageID.1196–97.) Her affidavit does not contradict her deposition testimony that there is no MDOC policy covering this job function.

- Paragraphs 7 and 8. In paragraph 7, Killough states generally that an article discussing prison conditions that are detrimental to the prison population can upset prisoners, cause riots, or make management of a facility more difficult. In paragraph 8, Killough indicates that an article discussing maggots or dirt in food, or spoiled food that was served to prisoners, can potentially cause a prisoner disruption, as was detailed in an article in the January 2018 edition of PLN. She states that an article containing such information should be rejected. (ECF No. 132-3 at PageID.1187.) Spencer contends that these paragraphs contradict her testimony regarding an article from the August 2018 edition of PLN marked as Exhibit 2, that she would not reject the article and did not see anything in the article that violated policy. (ECF No. 133-2 at PageID.1225–26.) But Killough's statements in these paragraphs do not address the specific article about which counsel questioned her during the deposition. In addition, Spencer fails to note that Killough also testified, "That's not to say that someone else couldn't look into it and see something that I didn't see. And I would take into consideration their concern, but I didn't see anything." (*Id.* at PageID.1226.) Further, when defense counsel questioned Killough about the article, she noticed something that could have been a problem—prisoners and their advocates protesting high commissary prices. (ECF No. 137-1 at PageID.1349–50.) Moreover, Killough testified that an article from the January 2020 edition of PLN mentioning protests by students, prisoners, and guards regarding the poor food quality and service provided by MDOC's contract food provider, Aramark, could violate the policy as it identifies protesting as response to prison conditions and could be interpreted as encouraging group disruption. (*Id.* at PageID.1347.)

- Paragraph 12. In this paragraph, Killough states that reporting on riots at other prison facilities, whether or not they are within MDOC, which discusses the reasons for those riots should be carefully scrutinized because they can provide a foundation of ideas to start a riot in a facility. (ECF No. 132-3 at PageID.1189.) Spencer says that this paragraph contradicts Killough's testimony about the article marked as Exhibit 2 identified above. This argument lacks merit, not only because Killough is simply making a general statement that does not refer to the article presented to her in the deposition, but also because Killough indicated that Exhibit 2 could present concerns.

- Paragraph 13. In this paragraph, Killough states that PLN's reporting on lawsuits can present an issue under the mail policy if the article identifies a prisoner by name or an identifiable class of prisoners who received a settlement or award because that information could create a risk of harm if other prisoners learn that the prisoner or class of prisoners mentioned in the article has received funds. (ECF No. 132-3 at PageID.1189.) Spencer points to the article in the July 2019 edition of PLN that Dollar initially rejected but Spencer ultimately received, and Killough's testimony that the article did not violate policy and she would not reject it. (ECF. No. 133-2 at PageID.1228.) Spencer fails to show an inconsistency, as he concedes that the article mentions nothing about damages awarded to the plaintiffs or the class members. (ECF No. 133 at PageID.1201.) Spencer also points to the other article

8

in the July 2019 edition of PLN mentioning that a prisoner was awarded $40,000 for being denied due process in connection with a parole violation. Killough said there would be no reason to reject this article, and in fact, it was ultimately given to Spencer after Dollar initially rejected it. (ECF No. 133-2 at PageID.1226, 1228.) There is nothing inconsistent about paragraph 13, however, because the prisoner in the article was no longer in prison.

- Paragraph 14. In this paragraph, Killough discusses concerns that may arise when an article describes allegations against a corrections officer in a lawsuit that may impact the officer's ability to effectively do his job because other prisoners may disregard that officer's authority or "rise up . . . against the officer accused of the misconduct." (ECF No. 132-3 at PageID.1189.) As with paragraph 13, this is a general statement that does not mention a specific article. Spencer fails to show that the paragraph contradicts Killough's deposition testimony.

Accordingly, I recommend that his motion be denied.

### B.    Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment on Spencer's remaining claims.

### 1.    Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

9

## 2.    Qualified Immunity

Defendants contend that they are entitled to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that defendant violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable office[ial] would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. In order to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that his or her conduct violates that right. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). As the Supreme Court has observed, "this Court's

case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "'[C]learly established law' may not be defined at such 'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* (quoting *White*, 137 S. Ct. at 552). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019).

### 3.    Analysis

It is well established that prisoners have a First Amendment right to receive mail. *See Parrish v. Johnson*, 800 F.2d 600, 603 (6th Cir. 1986) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). This right, however, is limited by a prison's legitimate penological interests. *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996); *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992). Prisoners retain only "those First Amendment rights of speech 'not inconsistent with [their] status as . . . prisoner[s] or with the legitimate penological objectives of the corrections system.'" *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (quoting *Pell*, 417 U.S. at 822). In light of security concerns inherent in the prison setting, rules promulgated to screen or reject unacceptable mail items must be "exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (quoting *Turner v. Safley*, 482 U.S. 78, 85 (1987)). Courts must be "sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate

demands of those on the 'outside' who seek to enter that environment, in person or through the written word." *Id.* at 407. The Court in *Thornburgh* described the specific challenges that incoming mail presents:

> We deal here with incoming publications, material requested by an individual inmate but targeted to a general audience. Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore, prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly. As the Deputy Solicitor General noted at oral argument: "The problem is not ... in the individual reading the materials in most cases. The problem is in the material getting into the prison." In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder.

*Id.* at 412–13 (citations omitted); *see also Jones v. Caruso*, 569 F.3d 258, 270 (6th Cir. 2009) (prison officials should be accorded "wide-ranging" deference in the adoption and execution of policies they deem necessary to maintain institutional security). On the other hand, prison officials do not have carte blanche to reject anything and everything. The Supreme Court "'has held unconstitutional the censorship of prisoner mail when prison officials censor simply by indulging their "personal prejudices and opinions," while purporting to apply constitutional standards.'" *Id.* at 267 (quoting *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985) (quoting *Procunier v. Martinez*, 416 U.S. 396, 415 (1974))).

The applicable standard is the deferential *Turner* standard: whether the challenged regulation is "reasonably related to legitimate penological interests." *Thornburgh*, 490 U.S. at 413. Spencer must show that the regulation, as applied by each Defendant to each item of incoming mail, was not reasonably related to legitimate penological objectives. *Murphy v. Karber*, No. 1:14-cv-269, 2017 WL 4160949, at *13 (W.D. Mich. Sept. 20, 2017) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")); *see also Figel v. Overton*, 121 F. App'x 642, 646 (6th Cir.

12

2005) (noting that in an as-applied challenge, the question is whether the defendant's application of the policy was reasonably related to a legitimate penological interest). The factors used to analyze a regulation are: (1) whether a valid rational connection exists between the regulation and a legitimate penological interest; (2) whether the inmate has alternative means to exercise the right impinged; (3) what impact, if any, accommodating the prisoner's constitutional right will have on guards, or other inmates, or the allocation of resources generally; and (4) whether there are ready alternatives to the regulation in question. *Turner*, 482 U.S. at 88–91. Considering these factors, the court must determine whether the rejections were reasonably related to legitimate penological objectives or whether they represent "an 'exaggerated response to those concerns.'" *Heritage Bible Fellowship v. Karber*, No. 17-2278, 2019 U.S. App. LEXIS 1529, at *7 (6th Cir. Jan. 16, 2019) (quoting *Turner*, 482 U.S. at 87).

### a.      Defendant Dollar

As an initial matter, Spencer cannot show that Defendant Dollar's rejection of the July edition of PLN violated his First Amendment rights because, as noted above, Spencer ultimately received that edition of PLN following an administrative hearing. While Defendant Dollar initially flagged the publication on July 11, 2019, Spencer received his July edition of PLN about a week later following the administrative hearing.

Spencer concedes that the rejection was overturned, and he does not deny receipt of this edition of PLN.[6] Moreover, Spencer does not assert a claim for delayed receipt of his mail, nor does he allege that the delay was "inordinate or intentional," or due to anything other than the administrative appeal process. *Karber*, 2019 U.S. App. LEXIS 1529, at *4–5. Accordingly, I

---

[6] Spencer erroneously indicates that Defendant Sanford's rejection of the June 2019 edition of PLN (containing the article about the WHV litigation) was overturned. (ECF No. 131 at PageID.1090.) There is no evidence in the record that such rejection was overturned by a hearing officer.

recommend that Defendant Dollar is entitled to summary judgment on Spencer's claim against her.[7]

### b.      Defendant Sanford

#### *June 2018 Rejection*

The particular provisions of Policy Directive 05.03.118, Paragraph NN, that Sanford cited as authority for rejecting the March 2018 PLN article about Trinity Services Group preclude "[m]ail that may pose a threat to the security, good order, or discipline of the facility, facilitate criminal activity, or interfere with the rehabilitation of the prisoner," and "[m]ail advocating or promoting violence, group disruption, or insurrection." These provisions are clearly aimed at, and reasonably related to, maintaining security at MDOC facilities—a well-established legitimate penological interest. *Thornburgh*, 490 U.S. at 415.

This particular article does not fit the general theme of Spencer's current complaint because it does not mention a lawsuit or settlement by or against the MDOC. Sanford determined that it should be rejected because it mentions that Trinity employees were cited for numerous instances of misconduct, including smuggling contraband into a prison (which Sanford believed to be heroin) and having improper relationships with prisoners. (ECF No. 122-4 at PageID.999.) And, as Spencer concedes, the article also mentions hunger strikes at several MDOC facilities and a riot at Kinross Correctional Facility over the quality of the food that Trinity was serving prisoners.

Spencer argues that this article should not have been rejected because only one line out of its 19 paragraphs mentions Trinity violations, it does not expressly mention heroin, and, because it provides no specifics regarding the Trinity employee misconduct, a prisoner would have no idea

---

[7] Spencer's successful administrative hearing undermines his allegation in his complaint that "[a]ny subsequent administrative hearing, if conducted at all, is often considered a nuisance and a waste of time by the hearing officer." (ECF No. 122 at PageID.960.)

how to replicate the offending employee behavior for improper purposes. He also notes that the article mentions that the MDOC had announced it would no longer be using Trinity for food service, and Trinity was no longer an MDOC contractor in June 2018. (ECF No. 131 at PageID.1089.)

Spencer has shown nothing more than his disagreement with Sanford's exercise of her discretion and judgment in applying the mail policy. In *Murphy v. Karber,* No. 1:14-cv-269, 2017 WL 4160949 (W.D. Mich. Sept. 20, 2017), Judge Maloney held that the prison's rejection of two PLN articles containing details of prisoner escapes from a non-MDOC facility and a hospital was "patently reasonable" given that the plaintiff was housed in segregation following a failed escape attempt. *Id.* at \*13. He also held that the prison properly rejected a New York Times article discussing the 1971 Attica prison riot in New York, noting that the article could be interpreted either as an op-ed on much needed penal reforms or supplying justifications for prisoners to riot and to take and kill hostages. *Id.* at \*15. While the Trinity article in this case does not provide the same level of detail as the articles in *Murphy*, it nonetheless touches on legitimate security concerns—use of MDOC contractor employees, or even direct employees, to facilitate introduction of contraband into prisons and protesting or rioting in response to prison conditions—providing a reasonable basis to conclude that it may threaten the good order or security of the facility. As Dollar and Sanford both state, applying the mail policy to incoming publications is not an exact science, and mailroom staff must use their best judgment because it is impossible to determine how prisoners will actually respond to particular information. (ECF No. 129-2 at PageID.1047–48; ECF No. 129-3 at PageID.1052.) Moreover, the Sixth Circuit has instructed that "the issue is not whether the prohibited materials have in fact caused problems or are even 'likely' to cause problems, but whether a reasonable official might think that the policy advances these

15

interests." *Hanrahan v. Mohr*, 905 F.3d 947, 958 (6th Cir. 2018) (internal quotation marks omitted). Here, at a minimum, reasonable officials could certainly disagree about the article's possible effect on the prison population.

Finally, Spencer's claim that the rejection was based on Sanford's own prejudices and opinions rather than legitimate security concerns misconstrues Sanford's (and Dollar's) deposition testimony. While Sanford referenced her "beliefs" when counsel asked her what could cause "violence" as used in the mail policy (ECF No. 132-2 at PageID.1181), she was merely referring to the judgment and discretion she must use to apply the MDOC's broadly-worded policy to specific situations. No mailroom employee could possibly apply the policy—which invokes general concepts such as security, good order, discipline, and group disruption—without some measure of belief or opinion as to what content might pose a problem within the facility. Accordingly, the first *Turner* factor is satisfied.

The second factor, alternative means, is also satisfied. Spencer does not allege that Sanford (or Dollar) or the MDOC in general rejected every issue, or even most issues, of his subscription to PLN. (ECF No. 129-2 at PageID.1048; ECF 129-3 at PageID.1054.) In addition, Spencer concedes that he has access to a variety of PLN books and manuals (owning eight of them), and he points out that many of the articles in PLN are re-publications of articles that have appeared in local newspapers or have been aired by radio or television sources. (ECF No. 122 at PageID.957.) Thus, Spencer has access to a wide range of PLN and other publications that are not precluded under the MDOC's mail policy.

As for the third factor, allowing Spencer to receive an article containing information that might provide prisoners with ideas on circumventing prison rules or formulating a disruptive response to prison conditions could impact prison security and make it more difficult for prison

officials to manage the prison population, even if Spencer was not the one instigating the disturbance. *Thornburgh*, 490 U.S. at 413. Finally, as to the last factor, Spencer points to no "obvious, easy alternatives" indicating that Sanford's decision to reject the article was "an exaggerated response." *Turner*, 482 U.S. at 90.

In sum, Spencer fails to show that the rejection of the Trinity article violated his First Amendment rights, let alone his clearly established constitutional rights in a sufficiently particularized sense required to overcome the defense of qualified immunity.

### *June 2019 Rejection*

Defendant Sanford rejected the June 2019 edition of PLN because of the article discussing the three lawsuits at WHV. She cited the same provisions of Policy Directive 05.03.118 that she relied on in making the June 2018 rejection. Sanford determined that the article should be rejected because it mentioned inmate overcrowding and contained information about current lawsuits. Whether Sanford's application of the mail policy to this article was reasonably related to legitimate penological concerns presents a close question. On the one hand, it is doubtful that the information about the Department of Justice action on behalf of female guards and the state-court action alleging a lack of opportunities for male guards reasonably presented a legitimate penological concern under Policy Directive 05.03.118. The portions of the article discussing those lawsuits concerned matters that, for the most part, involved only prison guards and did not mention any guard by name or any issue that would appear to directly affect prisoners. On the other hand, the portion of the article regarding overcrowding and harsh prison conditions at WHV could have arguably raised a legitimate concern, as it discusses conditions directly affecting MDOC prisoners, albeit at a different facility. When asked about her reasons for rejecting the article during her deposition, Sanford noted that WHV is an MDOC facility that was experiencing significant

17

problems, including overcrowding, inadequate healthcare, and poor ventilation. (ECF No. 122-2 at PageID.978–79.) She further states that because "[t]here is no black and white line for what will and will not cause a problem, we have to think very broadly and contemplate ways that prisoners may view content." (ECF No. 129-3 at PageID.1052.) Killough, who, as previously noted, was involved in developing the MDOC's mail policy, states that articles that mention prison conditions that are detrimental to prisoners should be rejected because such details can upset prisoners, cause riots, or make it more difficult to manage the population. (ECF No. 132-3 at PageID.1187.)

Spencer contends that Sanford violated his rights by arbitrarily rejecting the article based on her own prejudice and bias against prisoners and in favor of the MDOC merely because the article involved lawsuits against the MDOC. Spencer further notes that Sanford admitted that she has rejected articles reporting on lawsuits against the MDOC under Paragraph NN#4 of Policy Directive 05.03.118 and that such rejections are based solely on her "beliefs" as to what may constitute a security threat. (ECF No 131 at PageID.1080–81, 1086.) Spencer further argues that Defendants have not articulated a legitimate reason to reject articles discussing lawsuits against the MDOC because their rationale is based solely on speculation rather an actual factual basis establishing that such articles threaten the security interests of the prison. (*Id.* at PageID.1086.)

Despite Spencer's characterization of Sanford's (and Dollar's) deposition testimony as indicative of bias and prejudice aimed at protecting the MDOC from bad press, in my judgment, the testimony illustrates the challenges that MDOC mailroom employees face in applying a general directive regarding lawsuits in the context of the mail policy. According to Defendant Dollar, MDOC officials had instructed mail room staff in the past to closely examine articles regarding lawsuits against the MDOC, but apparently without providing more specific guidelines. (ECF No. 129-2 at PageID.1047.) Nonetheless, rejection of an article solely because it discusses a lawsuit

18

against the MDOC would not only be arbitrary, but clearly "an exaggerated response." *Turner*, 482 U.S. at 90. But Sanford did not testify that was her practice. Instead, she would need to see the contents of the article to determine whether it contained information that might present a security risk. (ECF No. 122-2 at PageID.978–80.) In addition, there are circumstances in which rejection of an article would reasonably further the prison's legitimate penological interests. Killough identified two: (1) an article that mentions a prisoner by name who has received a financial settlement or verdict in a lawsuit against the MDOC; and (2) an article mentioning a guard by name and describing allegations that may impact his performance of his duties or subject him to risk of attack. (ECF No. 132-3.) It is not difficult to imagine other circumstances supporting rejection, for example, an article that names a prisoner and includes specific information about his lawsuit that identifies him as homosexual, a sex offender, or a source of information about criminal activity to the MDOC or law enforcement. Furthermore, the regularity of prisoner transfers in the MDOC provides added reason to prevent such information from entering the prison population, even though the prisoner may not currently be incarcerated at the particular facility.

In the end, however, it is unnecessary to determine whether Sanford's rejection violated Spencer's First Amendment rights as he has failed to point to clearly established law that would have put Sanford on notice that rejecting an article containing information about lawsuits against a prison or its personnel deemed detrimental to the good order or security of the facility violates the First Amendment. *See Morgan v. Fairfield Cnty.*, 903 F.3d 553, 564 (6th Cir. 2018) ("'There does not need to be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). I thus conclude that Sanford is entitled to qualified immunity on this claim.

Accordingly, I recommend that Defendants are entitled to summary judgment on Spencer's First Amendment claims.

### C.    Motion for Leave to Amend

Spencer sued Defendants Dollar and Sanford only in their individual capacities in this third amended complaint. He now seeks leave to amend to add official capacity claims against them for purposes of seeking injunctive and declaratory relief. In particular, Spencer seeks a declaratory judgment that will prevent MDOC employees from arbitrarily rejecting issues of his PLN subscription on the basis that they discuss lawsuits against the MDOC if he is transferred to a new facility. Spencer recognizes that he may not obtain injunctive or declaratory relief as to Defendant Dollar because she is no longer employed with the MDOC. However, he seeks to substitute the person who replaced Dollar as a defendant in this case upon learning that person's identity.

Pursuant to Fed. R. Civ. P. 15(a)(2), "a court should freely give leave [to amend] when justice so requires." A court may deny leave "in cases of undue delay, undue prejudice to the opposing party, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or futility." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Spencer's motion is properly denied on grounds of undue delay and futility.

"Ordinarily, delay alone, does not justify denial of leave to amend." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). "At some point, however, 'delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party.'" *Id.* (quoting *Adams v. Gould*, 739 F.2d 858, 863 (3d Cir. 1984)). Undue delay can occur when a party seeks to amend after case deadlines have expired. In *Duggins*, the Sixth Circuit observed that "allowing amendment after the close of discovery creates significant prejudice." 195 F.3d at 834. Courts will also consider whether the plaintiff timely moved for

amendment after becoming aware of new facts or claims necessitating the amendment. *See Veeder v. TRI-CAP*, No. 17-cv-11690, 2019 WL 4387380, at *6 (E.D. Mich. June 7, 2019), *report and recommendation adopted*, 2019 WL 2895712 (E.D. Mich. Jul. 3, 2019). In *Veeder*, the court denied leave because, among other things, the case was over two years old and near the end of the pretrial stage and the plaintiff sought leave "without explanation or justification" to add "new claims and new parties that he must have known about before he filed the original complaint." *Id.* Similarly, in *Palmer v. Burke*, No. 1:12-cv-912, 2014 WL 1418294, at *3 (S.D. Ohio Apr. 14, 2014), *report and recommendation adopted*, 2014 WL 4659485 (S.D. Ohio Sept. 17, 2014), the court concluded that the plaintiff's "late stage" motion to amend should be denied because the plaintiff "put forth no explanation for his failure to seek an amendment earlier in these proceedings." The court noted that the plaintiff did nothing in the case until after the discovery deadline had passed, and the defendants filed their motion for summary judgment. *Id.*

Spencer filed his complaint in this case on June 7, 2018. More than a year later, on October 20, 2019, and after Spencer obtained counsel, he filed a motion for leave to file a first amended complaint to add class allegations, new Defendants, and new claims (ECF No. 59), which the Court granted on December 23, 2019. (ECF No. 71.) Thereafter, Defendants filed a motion to dismiss, and Spencer filed a motion to file a third amended complaint. (ECF Nos. 79 and 86.) On August 17, 2020, I issued a Report and Recommendation that the motion to dismiss be granted, combined with an order granting Spencer leave to amend his complaint a third time to allege as-applied First Amendment claims against Defendants Dollar and Sanford. (ECF No. 112.) On September 28, 2020, the Court adopted the Report and Recommendation. (ECF No. 120.)

Spencer filed his third amended complaint on October 3, 2020. (ECF No. 122.) Defendants filed their instant motion for summary judgment on January 21, 2021, which was fully briefed by

March 3, 2021. (ECF No. 132.) Still, Spencer waited almost another month before filing his motion for leave to file a fourth amended complaint. Spencer knew that, for whatever reason, he had only sued Dollar and Sanford in their individual capacities. Yet, he waited 111 days after the close of discovery and 69 days after the dispositive motion deadline to file his motion. As in *Palmer*, *supra*, Spencer provides no explanation for his failure to seek leave to amend at an earlier time in this proceeding, even though nothing prevented him from doing so.

Although I need not address futility, it is an alternate ground for denial. Spencer's request to add official capacity claims demonstrates that the injunctive and declaratory relief he seeks is against the MDOC and its officials, not against Dollar and Sanford based on their alleged as-applied violations. In addition, Spencer's claim for injunctive and declaratory relief against Defendant Dollar is moot because she is no longer employed with the MDOC, *see Porter v. Barsch*, No. 2:14-cv-255, 2017 WL 9481043, at *3 (W.D. Mich. Sept. 5, 2017), and there is no basis to issue injunctive or declaratory relief against an individual who did not misapply MDOC policy or violate the plaintiff's constitutional rights. Finally, Spencer would seek a broad declaration that precludes the MDOC from rejecting any article that mentions a lawsuit against the MDOC, regardless of the detail it contains. In other words, Spencer seeks relief that would strip MDOC officials of the substantial deference they are afforded in maintaining prison security, discipline, and order. Such a request is untenable.

## IV.   Conclusion

For the foregoing reasons, I recommend that Defendants' motion for summary judgment (ECF No. 128) be **granted** and that Spencer's motion to strike (ECF No. 133) be **denied**.

In addition, **IT IS ORDERED** that Spencer's motion for leave to file fourth amended complaint (ECF No. 135) is **denied**.

Dated: July 2, 2021                                 /s/ Sally J. Berens
                                                    SALLY J. BERENS
                                                    U.S. Magistrate Judge

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).